## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MARYLAND

| | | |
|---|---|---|
| IN RE: POTOMAC ENVIRONMENTAL TECHNOLOGIES, INC. | ) ) ) ) | Case No. 10-33825 RAG Chapter 11 |

---

| | | |
|---|---|---|
| POTOMAC ENVIRONMENTAL TECHNOLOGIES, INC. | ) ) ) | |
| Debtor, | ) ) | |
| vs. | ) ) | |
| PIERCE ASSOCIATES, INC. | ) ) | |
| Serve: Edward A. Bloom, Esquire 6817 Massena Court Bethesda, Maryland 20817 Resident Agent for Pierce Associates, Inc. | ) ) ) ) ) ) | |
| and | ) ) | Adversary No. _____ |
| LIBERTY MUTUAL INSURANCE COMPANY | ) ) ) | |
| Serve: Insurance Commissioner Maryland Insurance Administration 525 St. Paul Place Baltimore, Maryland 21202 Resident Agent for Liberty Mutual Insurance Company | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## ADVERSARY COMPLAINT
## OF POTOMAC ENVIRONMENTAL TECHNOLOGIES, INC.

Potomac Environmental Technologies, Inc. ("Peptec"), by and through its undersigned counsel, submits the following as its Complaint against Pierce Associates, Inc. ("Pierce") and Liberty Mutual Insurance Company ("Liberty"), stating as follows:

## PARTIES AND JURISDICTION

1.      Peptec is a Maryland corporation located at 11684 Cedarline Court, Ellicott City, Maryland 21042. For the last 16 years, Peptec has been involved in the commercial construction industry, specifically the representation of manufacturers of mechanical equipment.

2.      Defendant Pierce is a Virginia corporation with its principal place of business located at 4216 Wheeler Avenue, Alexandria, Virginia, 22304.  Pierce is a mechanical contractor in the commercial construction industry.

3.      Defendant Liberty is, upon information and belief, a Massachusetts corporation engaged in the business of, among other things, a compensated surety issuing payment bonds for construction projects.  Liberty, as surety, issued the payment bond for Pierce in connection with the construction project at issue in this litigation.

4.      This court has jurisdiction over this core proceeding pursuant to 28 U.S.C. § 157, 28 U.S.C. § 1334, 11 U.S.C. § 105, 11 U.S.C. § 362, and Rule 7001 of the Federal Rules of Bankruptcy Procedure.

5.      Presently, there is an action pending in the United States District Court, Eastern District of Virginia captioned *Pierce Associates, Inc. vs. Potomac Environmental Technologies, Inc., et. al.,* Case No. 1:10cv725-TSE-TRJ (the "Virginia Action") in which Pierce has asserted a claim against Peptec in excess of $2.7 million and in which Peptec has asserted a counterclaim against Pierce and a third party claim against Liberty for an amount not less than $2,368,424.19. Peptec has recently filed a Notice of Stay in said action.

## FACTS

6.      This dispute arises out of a construction project known as the National Geospatial-Intelligence Agency/New Campus East facility located in Fort Belvoir (the "Project").

7.      On or about November 5, 2007, Clark/Balfour Beatty, the prime contractor for the Project, entered into a subcontract agreement with Pierce under which Pierce agreed to perform the mechanical scope of work.

8.      On or about February 22, 2008, Liberty, as surety to Pierce, provided a payment bond bearing bond number 017010665 (the "Bond") to satisfy Pierce's contractual obligation to Clark/Balfour Beatty for such under their subcontract.  A true and accurate copy of the Bond is incorporated herein and attached hereto as **Exhibit 1**.

9.      Under the Bond, Liberty agreed to "promptly make payment to all persons supplying labor and material in the prosecution of the work provided for in said subcontract." *See*, Exhibit 1.

10.      Further, Liberty promised that "this Bond shall inure to the benefit of all persons supplying labor and material in the prosecution of the work provided for in said Subcontract, …." *See*, Exhibit 1.

11.      Finally, Liberty agreed that "all persons supplying labor and material in the prosecution of the work provided for in said Subcontract … may maintain independent actions upon this Bond in their own names."  *See*, Exhibit 1.

12.      On or about June 28, 2008, Peptec, in response to a solicitation from Pierce, submitted a bid proposal to Pierce offering to provide twelve (12) Air Handler Units ("AHUs") for the Project.

13.     Peptec's proposal quoted a price of $6,888,000 for the work, excluding sales tax. A copy of the June 29, 2008 Peptec bid proposal is incorporated herein by reference and attached hereto as **Exhibit 2**.

14.     Pierce accepted and agreed with Peptec's bid proposal on June 29, 2008.

15.     On or about October 2, 2008, Pierce issued a Purchase Order Confirmatory Memorandum back dated to September 23, 2009.  A copy of the October 2, 2008 Purchase Order Confirmatory Memorandum is incorporated by reference and attached hereto as **Exhibit 3.**

16.     Peptec did not sign the Purchase Order Confirmatory Memorandum.

17.     Peptec performed its obligations at the Project pursuant to its bid proposal and agreement with Pierce.

18.     On December 23, 2009, Pierce proposed to Peptec a modification to their agreement entitled "Confirmatory Change Order No. 1."

19.     Under this document, Pierce proposed to increase the amount owed to Peptec for its work at the Project by $1,498,225.  A true and accurate copy of the December 23, 2009 Confirmatory Change Order No. 1 is incorporated herein by reference and attached hereto as **Exhibit 4**.

20.     In order to receive partial payment by Pierce in the amount of $828,364.66 for work performed by Peptec on the project, Pierce required Peptec to sign Confirmatory Change Order No. 1on January 29, 2010.  *See*, Exhibit 3.

21.     Including the amount added to the Purchase Order by Confirmatory Change Order No. 1, the total sum Pierce agreed to pay Peptec for its work at the Project was $8,386,225, plus sales tax of another $384,911.25, for a total sum of $8,771,136.25.

22.     Peptec has fully, properly and completely performed its obligations to Pierce in connection with the Project.

23.     To date, Pierce has paid Peptec only $3,703,864.31.

24.     To date, Pierce has paid Peptec's vendors $3,463,514.68.

25.     Thus, the total paid to date by Pierce, either directly to or on behalf of Peptec, is $7,167,378.99.

26.     Additionally, Peptec has agreed to a further credit in favor of Pierce in the amount of $45,333.07.

27.     Consequently, the total amount remaining to be paid to Peptec by PAI Pierce is $1,558,424.19, inclusive of the incurred sales tax.

28.     Peptec's June 11, 2008 bid proposal contained a proposed schedule for Peptec's performance of its work and delivery of the AHUs for the Project.

29.     At that time, Pierce and Peptec understood that while no specific delivery date for the AHUs existed, delivery was tentatively anticipated to commence in April of 2009 and continue to March of 2010.

30.     The parties understood and agreed that Peptec could not fabricate the AHUs until the design for such was finalized.

31.     Peptec was not responsible for the design of the AHUs.

32.     The design of the AHUs changed constantly from 2008 through October of 2009.

33.     Elements of the design essential to the fabrication of the AHUs, such as their size, height, width, air flow capacity, valves and other critical elements, were not finalized until October of 2009.

34.     Without a confirmed and final design, Peptec was prevented from completing the fabrication, and thus the delivery, of the AHUs.

35.     On December 31, 2009, Pierce proposed a revised delivery schedule for the AHUs through a document entitled Confirmatory Change Order No. 2.  A true and accurate copy of Confirmatory Change Order No. 2 dated December 31, 2009 is incorporated herein and attached hereto as **Exhibit 5**.

36.     Peptec did not sign Confirmatory Change Order No. 2.

37.     Under this proposal, Peptec was to deliver AHUs F, E, D, B, C and A in January, February and March of 2010.

38.     The continued modification of the design of these units, which design was to have been finalized months earlier, deprived Peptec of the anticipated fabrication duration.  It also prevented Peptec from delivering the units to the project by the dates which Pierce desired.

39.     In order to accelerate the completion of the AHUs for the Project, on October 31, 2009, Peptec entered into a purchase order with a competitor, Seasons-4, Inc., under which Seasons-4, Inc. was to complete the fabrication and delivery of AHUs A, B, C and D.

40.     Peptec was not obligated to take this step, but did so as an effort to accelerate the completion of the AHUs because of the compressed time frame Pierce had imposed upon it.

41.     Peptec delivered to the Project prior to December 31, 2009, six (6) AHUs, designated as AHUs L1, L2, L3, L4, H and G.

42.     Peptec's delivery of these six (6) AHUs was in substantial compliance with the delivery dates Pierce had requested for the same.

43.     Peptec delivered AHU F to the Project in January of 2010.

44.    Peptec's delivery of AHU F was in substantial compliance with the delivery date Pierce had requested for the same.

45.    Peptec completed AHU E and was ready to deliver it to the Project in February of 2010.

46.    The delivery of AHU E, specifically its transportation from Oregon to the Project, was impacted by severe winter weather outside of Peptec's control.

47.    Peptec's delivery of AHU E was in substantial compliance with the delivery date PAI had requested for the same.

48.    Seasons 4, Inc., on behalf of Peptec, delivered AHUs D, C, B and A to the Project substantially in compliance with the delivery dates Pierce had requested for the same.

49.    Furthermore, by the end of January of 2010, Peptec had not received a payment from Pierce for several months, despite having supplied seven (7) AHUs by that time.  This failure of payment constituted a material breach of the parties' agreement by Pierce.

50.    On January 28, 2010, Peptec conferred by telephone with Pierce to discuss the outstanding payment owed to it.

51.    At that time, Pierce agreed that it at least owed Peptec the sum of $828,364.66 for work through the end of January 2010.

52.    Further, Pierce agreed that Peptec could pick up a check in that amount at its offices the next day, on January 29, 2010.

53.    During the conversation, Pierce made no request or demand upon Peptec for any security or representation in exchange for the payment.

54.    However, in the evening on January 28, 2010, Pierce transmitted several documents to Peptec in connection with the $828,364.66 payment, including a corporate

guaranty document which had not previously been discussed as a requirement for the pending payment.

55.     On the morning of January 29, Peptec again conferred with Pierce and questioned the addition of new terms not previously discussed and Pierce's demand for the corporate guaranty.

56.     Pierce advised Peptec that no funds would be released unless Peptec executed all of the required documents.

57.     Facing significant financial pressure due to Pierce's failure to make payments for the prior several months, Peptec had no alternative but to execute the documents Pierce demanded.

58.     Consequently, on January 29, 2010, Peptec – in order to receive the $828,364.66 payment – executed Confirmatory Change Order No. 3.   A true and accurate copy of Confirmatory Change Order No. 3 dated January 29, 2010 is incorporated herein and attached hereto as **Exhibit 6**.

59.     Included within Confirmatory Change Order No. 3 was a "Corporate Guaranty" document and other paperwork; all of which Pierce demanded be executed in order to proceed with the promised payment.

60.     Even after Pierce released the $828,364.66 payment, it owed Peptec $1,558,424.19.

61.     The $1,558,424.19 amount is constituted by work performed to date by Peptec, its subcontractors and suppliers, to complete the AHUs, and also the incurred sales tax.

62.     Despite repeated demands upon it, Pierce has failed and refused pay Peptec the $1,558,424.19 contract sum which is due and owing.

8

63.     Pierce's failure is a material breach of its agreement with Peptec, and has caused damages to Peptec of not less than $1,558,424.19.

64.     In addition, Peptec has performed additional work for, or at the request of, Pierce which additional work was over and above the scope of its agreement.

65.     This additional work included substantial electrical re-wiring and controls wiring of the AHUs in the field.

66.     This additional re-wiring and controls wiring work was not within the scope of work Peptec and Pierce agreed Peptec would perform for the Project, and was not required due to any act or omission or fault on the part of Peptec.

67.     The fair and reasonable value of the additional re-wiring and controls wiring work Peptec performed is $370,000.

68.     Despite demand, Pierce has failed and refused to acknowledge this additional expense owed to Peptec, and has failed and refused to pay it.

69.     Additionally, due to the compression of the schedule and ongoing design changes, Peptec incurred additional expense and cost for the completion of the AHUs, primarily in the form of additional labor hours and acceleration of performance costs.

70.     The fair and reasonable value of the additional labor hours and accelerated performance charges incurred by Peptec due to compression of the schedule is $440,000.

71.     Despite demand, Pierce has failed and refused to acknowledge this additional expense owed to Peptec, and has failed and refused to pay it.

72.     Peptec was lured by Pierce to attend a meeting in Pierce's Virginia office on June 29, 2010, on the pretense of resolving the remaining contract issues.  Unbeknownst to Peptec,

Pierce had filed its action against Peptec on June 28, 2010 and, when Peptec's President, Wais Jalali, went to Pierce's office he was served with the summons and complaint.

73.     All conditions precedent to the institution of this action and/or the collection of the sums owed to Peptec by Pierce have been satisfied, waived or excused.

## COUNT I – BREACH OF CONTRACT
### (Contract Balance)

74.     Peptec incorporates by reference the allegations set forth in Paragraphs 1-64 set forth above.

75.     Pierce agreed to pay Peptec $8,771,136.25 for its performance in fabricating and delivering twelve (12) AHUs for the Project.

76.     Pierce has paid Peptec, or entities on Peptec's behalf, the total amount of $7,167,378.99, and Peptec has agreed to an additional credit to Pierce of $45,333.07.

77.     Peptec has fully and properly performed its obligations under the agreement with Pierce, but Pierce has failed and refused to pay to Peptec the remaining balance of $1,558,424.19, which amount is due and owing.

78.     Pierce has materially breached that agreement by failing to make payment of the $1,558,424.19 due and owing to Peptec.

79.     Pierce's breach of the agreement has caused damage to Peptec in an amount not less than $1,558,424.19.

**WHEREFORE** Potomac Environmental Technologies, Inc. demands judgment against Peirce Associates, Inc. in an amount not less than $1,558,424.19, plus interest, costs, attorneys' fees, and such other and further relief as this Court deems appropriate.

10

## COUNT II – BREACH OF CONTRACT
### (Additional Work – Field Re-Wiring and Controls Wiring)

80.     Peptec incorporates by reference the allegations set forth in Paragraphs 1-69 set forth above.

81.     At the request, direction and approval of Pierce, Peptec caused to be performed at the Project a significant amount of field re-wiring and controls wiring work.

82.     The additional field re-wiring and controls wiring work were beyond the scope of work Pierce and Peptec had agreed Peptec was to perform at the Project.

83.     The field re-wiring work and controls wiring work was not caused or necessitated by any act, omission, or fault on the part of Peptec.

84.     Peptec fully and completely performed the field re-wiring and controls wiring work as directed by Pierce.

85.     Despite demand upon Pierce, Pierce has failed and refused to recognize this field re-wiring and controls wiring work as extra to Peptec's scope, or to compensate it for its performance of this additional work.

86.     The fair and reasonable value of the field re-wiring and controls wiring work is $370,000.

87.     Pierce has materially breached its agreement with Peptec by failing to pay Peptec for its performance of the field re-wiring and controls wiring work in the amount of $370,000.

88.     Pierce's breach of the agreement in this regard has caused damage to Peptec in an amount not less than $370,000.

11

**WHEREFORE** Potomac Environmental Technologies, Inc. demands judgment against Peirce Associates, Inc. in an amount not less than $370,000, plus interest, costs, attorneys' fees, and such other and further relief as this Court deems appropriate.

## COUNT III – BREACH OF CONTRACT
### (Additional Work – Additional Labor)

89.     Peptec incorporates by reference the allegations set forth in Paragraphs 1-78 set forth above.

90.     The Peptec-Pierce agreement contemplated that a completed design of the AHUs would be achieved sometime in 2008.

91.     The design of the AHUs was modified up to and including October of 2009.

92.     The Peptec-Pierce agreement contemplated that Peptec would deliver the AHUs as follows:

|              |                    |
|--------------|--------------------|
| Core H Unit: | April 30, 2009     |
| Core G Units:| June 5, 2009       |
| Core F Units:| July 31, 2009      |
| Core E Unit: | September 4, 2009  |
| Core D Unit: | September 17, 2009 |
| Core C Unit: | December 15, 2009  |
| Core B Unit: | January 11, 2010   |
| Core A Unit: | March 17, 2010     |

93.     The contemplated schedule was completely compromised by the failure to timely achieve a final design of the AHUs.

94.     Indeed, as of October of 2009 – a date by which nine (9) of the twelve (12) units were to have been delivered to the Project – design modifications were continuing.

95.     Peptec did not have design responsibility for the Project's AHUs.

12

96.    However, despite the fact that Peptec was not provided with a completed design until October of 2009, Peptec was required to provide the Core H, Core G and part of the Core F AHUs by December of 2009.

97.    The remaining AHUs were to be delivered in January (AHUs F and E), February (AHUs D, C and B) and March (AHU A).

98.    This compression of the schedule significantly impacted Peptec, as it was required to complete its work in a timeframe significantly less than originally contemplated and agreed upon.

99.    In order to meet the shortened schedule, Peptec incurred substantial additional labor expense, including overtime labor costs, to accelerate its performance.

100.    The compression of the schedule and resulting acceleration was a change to the parties' agreement requiring additional expense, and was not caused or necessitated by any fault, act or omission of Peptec.

101.    Peptec fully and completely performed the work required of it under its agreement with Pierce, supplying all twelve (12) AHUs to the Project.

102.    Furthermore, Peptec substantially complied with the compressed schedule imposed upon it, delivering the Core H, Core G and part of Core F units by December 2009; delivering AHU F in early January, 2010; delivering AHU E in early February of 2010; delivering AHUs D, C and B in February of 2010; and delivering AHU A in March of 2010.

103.    Delivery of AHU E was delayed – not by any act or omission of Peptec – but rather by severe winter weather and an accident that occurred during its transport from Oregon to the Project.

13

104.    The cost incurred by Peptec to accelerate its performance under the compressed schedule and deliver the AHUs substantially in accordance with the schedule for the same was $440,000.

105.    The $440,000 amount is a fair and reasonable value for the accelerated work performed by Peptec.

106.    Despite demand upon Pierce, Pierce has failed and refused to recognize this acceleration cost as extra to Peptec's scope, or to compensate it for its performance of this additional work.

107.    Pierce has materially breached its agreement with Peptec by failing to pay Peptec for its acceleration costs in the amount of $440,000.

108.    Pierce's breach of the agreement in this regard has caused damage to Peptec in an amount not less than $440,000.

**WHEREFORE** Potomac Environmental Technologies, Inc. demands judgment against Peirce Associates, Inc. in an amount not less than $440,000, plus interest, costs, attorneys' fees, and such other and further relief as this Court deems appropriate.

### COUNT IV – BREACH OF PAYMENT BOND
**(Contract Balance)**

109.    Peptec incorporates by reference the allegations set forth in Paragraphs 1-105 set forth above.

110.    Under the Bond, Liberty promised to pay all persons supplying labor and materials in the prosecution of the work required of Pierce the sums they were owed.

111.    Peptec, by virtue of its providing labor and materials to Pierce in furtherance of Pierce's subcontract with Clark/Balfour Beatty for the Project, is a proper claimant under the Bond.

112.    The amount due and owing to Peptec for unpaid labor, materials, services and equipment furnished to the Project pursuant to its agreement with Pierce for the fabrication and delivery of the AHUs is $1,558,424.19.

113.    Pursuant to the Bond, Liberty is liable to Peptec for the unpaid amounts due to it by Pierce for its work in the prosecution of Pierce's subcontract obligations to Clark/Balfour Beatty at the Project.

**WHEREFORE** Potomac Environmental Technologies, Inc. demands judgment against Liberty Mutual Insurance Company in an amount not less than $1,558,424.19, plus interest, costs, attorneys' fees, and such other and further relief as this Court deems appropriate.

## COUNT V – BREACH OF PAYMENT BOND
### (Additional Work – Field Re-Wiring and Controls Wiring)

114.    Peptec incorporates by reference the allegations set forth in Paragraphs 1-110 set forth above.

115.    Under the Bond, Liberty promised to pay all persons supplying labor and materials in the prosecution of the work required of Pierce at the Project the sums they were owed.

116.    Peptec, by virtue of its providing the additional field re-wiring and controls wiring work to Pierce, supplied labor and materials in furtherance of Pierce's subcontract with Clark/Balfour Beatty for the Project and is thus a proper claimant under the Bond.

117.    The amount due and owing to Peptec for unpaid labor, materials, services and equipment furnished to the Project pursuant to its agreement with Pierce and at the direction of Pierce for the additional field re-wiring, is $370,000.00.

118.    Pursuant to the Bond, Liberty is liable to Peptec for the unpaid amounts due to it by Pierce for the additional field re-wiring work it performed in the prosecution of Pierce's subcontract obligations to Clark/Balfour Beatty at the Project.

**WHEREFORE** Potomac Environmental Technologies, Inc. demands judgment against Liberty Mutual Insurance Company in an amount not less than $370,000, plus interest, costs, attorneys' fees, and such other and further relief as this Court deems appropriate.

## COUNT VI – BREACH OF PAYMENT BOND
### (Additional Work – Additional Labor)

119.    Peptec incorporates by reference the allegations set forth in Paragraphs 1-115 set forth above.

120.    Under the Bond, Liberty promised to pay all persons supplying labor and materials in the prosecution of the work required of Pierce the sums they were owed.

121.    Peptec, by virtue of its providing additional labor to Pierce under the compressed schedule to complete and deliver the AHU's furthered Pierce's obligations under its subcontract with Clark/Balfour Beatty for the Project, and thus is a proper claimant under the Bond.

122.    The amount due and owing to Peptec for unpaid labor, materials, services and equipment furnished to the Project pursuant to its agreement with Pierce and at the direction of Pierce for the additional labor to complete the AHUs under the compressed schedule, is $440,000.00.

123.    Pursuant to the Bond, Liberty is liable to Peptec for the unpaid amounts due to it by Pierce for the additional labor expense incurred in completing the AHUs under the compressed schedule as such work aided Pierce in the prosecution of Pierce's subcontract obligations to Clark/Balfour Beatty at the Project.

**WHEREFORE** Potomac Environmental Technologies, Inc. demands judgment against Liberty Mutual Insurance Company in an amount not less than $440,000, plus interest, costs, attorneys' fees, and such other and further relief as this Court deems appropriate.

## COUNT VII – QUANTUM MERUIT/UNJUST ENRICHMENT

124.    Peptec incorporates by reference the allegations set forth in Paragraphs 1-120 set forth above.

125.    While Peptec and Pierce reached an accord with respect to the core terms of their agreement, that agreement was never reduced to a writing executed by the parties.

126.    Peptec conferred a benefit upon Pierce by completing the fabrication and delivery of twelve (12) AHUs for the Project.

127.    By fabricating and delivering the twelve (12) AHUs, Pierce received a number of benefits, including, but not limited to: payment of money for the AHUs and avoidance of damages charged by others to whom it owed obligations in connection with the Project.

128.    Pierce was aware of and knew that Peptec had fabricated and delivered the twelve (12) AHUs to the Project, and was also aware of and knew of the benefit conferred upon it by Peptec's action.

129.    Pierce was also further aware of and reasonably knew that Peptec expected to be paid for the twelve (12) AHUs, and indeed Pierce made partial payments to Peptec for those AHUs.

130.    Pierce has accepted and retained the benefit of Peptec's efforts without compensating it in full for the benefit conferred.

131.    Pierce's acceptance and retention of the benefit of Peptec's efforts under circumstances where it reasonably knew Peptec would be expecting, and indeed would be entitled, to payment for its efforts make it inequitable for Pierce to retain the benefits conferred without compensating Peptec.

132.    The fair and reasonable value of the benefit conferred by Peptec upon Pierce for fabrication and delivery of the twelve (12) AHUs is $8,771,136.25.

133.    Pierce has only made payment to or on behalf of Peptec for the twelve (12) AHUs in the total amount of $7,167,378.99.

134.    Including a credit recognized by Peptec of $45,333.07, there thus remains $1,558,424.19 owed to Peptec by Pierce, which amount is a fair and reasonable value of the benefit conferred by Peptec upon Pierce.

135.    Pierce's retention of the benefits conferred by Peptec is unjust.

136.    Under the doctrines of quantum meruit and/or unjust enrichment, Pierce is liable to Peptec for the $1,558,424.19.

**WHEREFORE** Potomac Environmental Technologies, Inc. demands judgment against Peirce Associates, Inc. in an amount not less than $1,558,424.19, plus interest, costs, attorneys' fees, and such other and further relief as this Court deems appropriate.

## COUNT VIII – QUANTUM MERUIT/UNJUST ENRICHMENT
### (Field Re-Wiring and Controls Wiring)

137.    Peptec incorporates by reference the allegations set forth in Paragraphs 1-133 set forth above.

138.    At the request, direction and approval of Pierce, Peptec caused to be performed at the Project a significant amount of field re-wiring work.

139.    Peptec fully and completely performed the field re-wiring work as directed by Pierce.

140.    Peptec conferred a benefit upon Pierce by completing the field re-wiring work at the Project.

141.    By completing the field re-wiring work, Pierce received a number of benefits, including, but not limited to: payment of money for the AHUs and avoidance of damages charged by others to whom it owed obligations in connection with the Project.

142.    Pierce was aware of and knew that Peptec had performed the field re-wiring work, and was also aware of and knew of the benefit conferred upon it by Peptec's efforts.

143.    Pierce was also further aware of and reasonably knew that Peptec expected to be paid for the field re-wiring work.

144.    Pierce has accepted and retained the benefit of Peptec's field re-wiring efforts without compensating it for the benefit conferred.

145.    Pierce's acceptance and retention of the benefit of Peptec's field re-wiring efforts under circumstances where it reasonably knew Peptec would be expecting, and indeed would be entitled, to payment for said efforts make it inequitable for Pierce to retain the benefits conferred without compensating Peptec.

146.    The fair and reasonable value of the benefit conferred by Peptec upon Pierce for the field re-wiring work is $370,000.

147.    Pierce's retention of the benefit conferred by Peptec is unjust.

148.     Under the doctrines of quantum meruit and/or unjust enrichment, Pierce is liable to Peptec in the amount of $370,000 for the field re-wiring.

**WHEREFORE** Potomac Environmental Technologies, Inc. demands judgment against Peirce Associates, Inc. in an amount not less than $370,000, plus interest, costs, attorneys' fees, and such other and further relief as this Court deems appropriate.

## COUNT IX – QUANTUM MERUIT/UNJUST ENRICHMENT
### (Additional Labor)

149.     Peptec incorporates by reference the allegations set forth in Paragraphs 1-145 set forth above.

150.     At the request, direction and approval of Pierce, Peptec caused to be performed a significant amount of additional labor hours to complete the twelve (12) AHUs within the compressed schedule's time requirements.

151.     Peptec substantially complied with the accelerated schedule's delivery requirements, even though the compressed schedule was not due to any fault, act or omission on its part.

152.     Peptec conferred a benefit upon Pierce by completing the fabrication and delivering the twelve (12) AHUs substantially within the delivery requirements of the compressed schedule.

153.     By completing delivery of the twelve (12) AHUs substantially in accordance with the compressed schedule, Pierce received a number of benefits, including, but not limited to: payment of money for the AHUs and avoidance of damages charged by others to whom it owed obligations in connection with the Project.

154.    Pierce was aware of and knew that Peptec had performed a significant amount of additional labor time and thus had incurred a substantial additional labor expense in meeting the compressed schedule's delivery requirements, and was also aware of and knew of the benefit conferred upon it by Peptec's efforts.

155.    Pierce was also further aware of and reasonably knew that Peptec expected to be compensated for the additional labor expense it absorbed in completing fabrication and delivery the twelve (12) AHUs under the compressed schedule.

156.    Pierce has accepted and retained the benefit of Peptec's additional efforts to comply with the compressed schedule without compensating Peptec for the benefit conferred.

157.    Pierce's acceptance and retention of the benefit of Peptec's acceleration and additional labor costs under circumstances where it reasonably knew Peptec would be expecting, and indeed would be entitled, to payment for said efforts make it inequitable for Pierce to retain the benefits conferred without compensating Peptec.

158.    The fair and reasonable value of the benefit conferred by Peptec upon Pierce for the additional labor to substantially meet the compressed schedule's delivery dates for the twelve (12) AHUs is $440,000.

159.    Pierce's retention of the benefit conferred is unjust.

160.    Under the doctrines of quantum meruit and/or unjust enrichment, Pierce is liable to Peptec in the amount of $440,000 for additional labor expended to substantially meet the compressed schedule.

**WHEREFORE** Potomac Environmental Technologies, Inc. demands judgment against Peirce Associates, Inc. in an amount not less than $440,000, plus interest, costs, attorneys' fees, and such other and further relief as this Court deems appropriate.

## COUNT X – INJUCTIVE RELIEF

161.    Peptec incorporates by reference the allegations set forth in Paragraphs 1-160 set forth above.

162.    In Pierce's Complaint in the Virginia Action ("Pierce's Complaint"), Pierce asserts four counts against Peptec, WDJ Capital Holdings, Inc. ("WDJ Capital Holdings") (the majority shareholder of Peptec) and Wais Jalali ("Jalali") (the majority shareholder of WDJ Capital Holdings): (1) Count I is for breach of contract; (2) Count II is for breach of corporate guaranty; (3) Count III is for actual and/or constructive fraud; and (4) Count IV is also for actual and/or constructive fraud.  At the end of each count, Pierce requests the Court enter judgment in it's favor against all three defendants -- Peptec, WDJ Capital Holdings, and Wais Jalali personally.  See Pierce's Complaint, without exhibits, in the Virginia Action attached hereto as **Exhibit 7**.

163.    Pierce alleges that Peptec breached its contract with Pierce because the AHU's were defective, causing Pierce damages as a result.  See Pierce's Complaint at ¶ 19.

164.    Pierce alleges in January 2010, in response to Peptec's demands for payment for the AHUs, which Pierce claims was not due, that it would make a payment in the amount of $828,364.66, only upon the condition that Peptec furnish Pierce with some form of alternate security, such as a corporate guaranty or letter of credit to satisfy Peptec's remaining obligations. See Pierce's Complaint at ¶ 25.

165.    Pierce alleges that, in response to Pierce's demands, Jalali represented to Pierce that in exchange for the payment, WDJ Capital Holdings and M&I West, two of Peptec's affliated companies, would satisfy all remaining obligations of Peptec and indemnify and hold

Pierce harmless for any and all losses suffered on the Project from Peptec's alleged defaults.  See Pierce's Complaint at ¶¶ 26, 99 and 109.

166.    Pierce alleges that, on January 29, 2010, Jalali executed the corporate guaranty (the "Corporate Guaranty") on behalf of WDJ Capital Holdings and M&I West confirming those representations.   See Pierce's Complaint at ¶¶ 27 and 110.   Further, Pierce alleges it relied on Jalali's representations in the Corporate Guaranty in making the payment.   See Pierce's Complaint at ¶ 101.

167.    Pierce alleges that: (1) at the time Jalali executed the Corporate Guaranty, he knew that both M&I West and WDJ Capital Holdings did not have the financial capability to satisfy Peptec's performance obligations to Pierce, Pierce's Complaint at ¶¶ 100-104 and 111-114; (2) Jalali executed the Corporate Guaranty with the expressed intent to defraud Pierce of the payment not yet due to Peptec under its contract with Pierce, Pierce's Complaint at ¶ 110;  and (3) Jalali used the corporate entities he owns and controls to perpetrate a fraud on Pierce, defraud Pierce, and deplete Peptec and WDJ Capital Holdings' assets, Pierce's Complaint at ¶ 116.

168.    Pierce alleges that due to Jalali's disregard of corporate formalities, his control and dominance over all the co-Defendants, and his intermingling of corporate identities and assets, the corporate legal entities through which Jalali purported to act should be disregarded and he should be held personally liable for the fraud perpetrated on Pierce through the submission of a false Corporate Guaranty.  See Pierce's Complaint at ¶ 117.

169.    Pierce's breach of contract actions against Peptec, WDJ Capital Holdings and Jalali are all based on the same alleged breach of the Peptec/Pierce contract.   Pierce alleges liability for breach of contract against WDJ Capital Holdings and Jalali is based on piercing the Peptec corporate veil.

170.    Pierce's breach of the corporate guaranty actions against Peptec, WDJ Capital Holdings, and Jalali are all based on the same alleged breach of the corporate guaranty.   Pierce alleges liability for breach of the corporate guaranty against Peptec and Jalali is based on piercing the WDJ Capital Holdings corporate veil.

171.    Pierce's fraud action actions against Peptec, WDJ Capital Holdings, and Jalali are all based on the same alleged misrepresentations/omissions.  Pierce alleges liability for the fraud against Peptec and Jalali is based on piercing the WDJ Capital Holdings corporate veil.

172.    Despite Peptec's bankruptcy, Pierce's Virginia Action will continue against WDJ Capital Holdings and Jalali, unless an injunction is issued to stay it.

173.    If Pierce's allegations of corporate veil piercing are successful, then Peptec, WDJ Capital Holdings and Jalali would be considered privies of one another for collateral estoppel purposes.

174.    If Pierce's Virginia Action continues to trial and judgment is entered against WDJ Capitol Holdings and Jalali, that judgment would have collateral estoppel affect against Peptec on Pierce's breach of contract claim, Peptec's breach of contract claim against Pierce, Pierce's breach of corporate guaranty claim, and Pierce's fraud claim -- because each of these causes of action will be decided in that adjudication and there will be a hearing and final judgment on the merits of that dispute that will be binding on Peptec.

175.    Peptec has a likelihood of success on the merits of its claim for an injunction; Peptec will suffer irreparable harm in the absence of injunctive relief; the balance of equities tip in favor of Peptec; and the  injunction is in the public interest.

176.    Peptec is entitled to injunctive relief restraining the prosecution of the Virginia Action against its co-defendants, WDJ Capital Holdings and Jalali.

**WHEREFORE** Potomac Environmental Technologies, Inc. requests this Court grant it an injunction restraining Peirce Associates, Inc. from prosecuting its case against WDJ Capital Holdings, Inc. and Wais Jalali in the United States District Court, Eastern District of Virginia, in the case captioned *Pierce Associates, Inc. vs. Potomac Environmental Technologies, Inc., et. al.,* Case No. 1:10cv725-TSE-TRJ and for such other and further relief as this Court deems appropriate.

By:     **/s/ Christopher L. Hamlin**
Christopher L. Hamlin, Esquire
**McNamee, Hosea, Jernigan, Kim,**
**Greenan and Lynch, PA**
6411 Ivy Lane, Suite 200
Greenbelt, MD 20770
301-441-2420 (telephone)
301-982-9450 (fax)
chamlin@mhlawyers.com

Counsel for Debtor